## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

### Baltimore Division

| | |
|---|---|
| Tamara Johnson<br>1215 Madison Street<br>Apartment A1<br>Annapolis, Maryland, 21403<br><br>and<br><br>Tyonna Holliday<br>1132 Frederick Douglass Street<br>Annapolis, Maryland 21403<br><br>Individually, and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br>  v.<br><br>The City of Annapolis<br>A municipal corporation<br>160 Duke of Gloucester Street<br>Annapolis, Maryland 21401<br>Anne Arundel County<br><br><br>       Defendant. | **Civil Action No.**<br><br><br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiffs by and through counsel, P. Joseph Donahue and The Donahue Law Firm, LLC, Peter A. Holland, Emanwel J. Turnbull and the Holland Law Firm, P.C. hereby sue the Defendants, and as grounds therefore state as follows:

> **It is the policy of the City, in the exercise of its police powers for the protection of the public safety, public health, and general welfare, to assure equal opportunity to all persons to live in decent housing facilities and to eliminate discrimination in all housing accommodations regardless of race, color, religion, disability, familial status, sexual orientation, gender identity, marital status, sex, source of income, immigration status, citizenship status, or national origin, and to that end to prohibit discrimination in all housing accommodations by any person.**

Annapolis City Code, Chapter 11.32 (Fair Housing) § 11.32.010 A.

## NATURE OF ACTION

The Named Plaintiffs file his action to vindicate their rights and the rights of the putative class members under the Fair Housing Act as amended, 42 U.S.C. § 3601, *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1982, 1983, 1985, and 1986; and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, and the City of Annapolis Municipal Code, §18.08.010.  The alleged violations are based on the fact that during the relevant time period the City of Annapolis affirmatively decided not to inspect, and failed to inspect, the properties owned and operated by the Housing Authority of the City of Annapolis (the "HACA Properties"), which are occupied by tenants, over 90% of whom are

African American.  This failure to inspect as required by law (including by the City's own Code) constitutes discrimination in housing (including discrimination as defined by the City's own Code).

This lawsuit follows and builds upon *White v. City of Annapolis*, Civil Action No. CCB-19-1442, and this court's ruling on the motions to dismiss in that case, located at 439 F.Supp.3d 522 (Feb. 3, 2020).  In that ruling, the court held that the Plaintiffs in that case stated claims for the following causes of action:

- disparate impact and/or disparate treatment under the Fair Housing Act;

- violation of the Equal Protection Clause;

- conspiracy to deprive Plaintiffs of their civil rights or privileges;

- disparate impact under the Americans With Disabilities Act and Rehabilitation Act;

- breach of contract under Maryland law.

Plaintiffs in this follow up action are predominately African American residents of the housing developments owned and operated by the Housing Authority of the City of Annapolis ("HACA" or the "Housing Authority").  In their individual capacities and as representatives of a putative class, the Named Plaintiffs in this action challenge the discriminatory policies of the City of Annapolis to forego its statutory obligation to inspect and license the leased properties owned by the Housing Authority.  At its simplest level, this case seeks to vindicate the rights of

the approximately 1,600 residents who were not party to the *White* case, and to compensate those individuals for the City's blatant violations of those rights.

## JURISDICTION AND VENUE

1.     This civil action arises under the laws of the United States of America. This Court has original jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 3613 (Fair Housing Act, private right of action for damages and injunctive relief).

2.     Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims brought under Maryland law because they are related to Plaintiffs' federal claims and arise out of a common nucleus of related facts.

3.     Venue herein is proper under 28 U.S.C. §§ 1391 (b)(1) and (2).  The Named Plaintiffs resided in the City of Annapolis, Anne Arundel County, Maryland. Defendant City of Annapolis maintains its principal place of business in the City of Annapolis, Anne Arundel County, Maryland, and the events or omissions giving rise to the claims occurred in this district and division.

## PARTIES

### Named Plaintiffs

4.     Named Plaintiff Tamara Johnson ("Ms. Johnson") is an African American woman.  She and her minor child live in Annapolis at 1215 Madison Street, Apartment A1, an apartment in Harbour House.

4

5.     Ms. Johnson and her daughter have lived in their Harbour House apartment since 2017.  In the time she has been there, the City has never inspected her home.

6.     Harbour House is owned by the Housing Authority of the City of Annapolis (HACA).

7.     The City's failure to inspect Ms. Johnson's HACA-owned rental property is in direct contrast to the City's inspection policy of rental properties in Annapolis that are not owned by HACA, and that which the City does inspect.

8.     The Johnson family has been forced to deal with sewage leaks from the apartment above into their bathroom.  Their bathroom floor tile was cracked and worn out, but when the pieces broke, the floor was not repaired for months, and so the family lived with the wooden plywood as their bathroom floor.

9.     The family has suffered through multiple rodent infestations.  They have had mice in their pantry and kitchen area which are a constant concern for contamination of their food.

10.    Throughout their entire period of residence, the family has had persistent mold growth throughout their apartment.  Because the City chose to abandon the inspections requirement, the Housing Authority has elected to simply wipe the mold with a rag and paint over it on multiple occasions, without ever truly remediating it.

11.   Ms. Johnson's minor daughter suffers from respiratory issues, and the mold and other conditions of the home make it difficult for her to breathe, so her doctor has prescribed her an inhaler.

12.   Named Plaintiff Tyonna Holliday ("Ms. Holliday") is an African American woman.  She and her minor children live in Annapolis at 1132 Frederick Douglass Street, a town house in Eastport Terrace.

13.   Eastport Terrace is owned by the Housing Authority of the City of Annapolis (HACA).

14.   Ms. Holliday and her children have lived in their Eastport Terrace town house since 2016.  In the time she has been there, the City has never inspected her home.

15.   The City's failure to inspect Ms. Johnson's HACA-owned rental property is in direct contrast to the City's inspection policy of rental properties in Annapolis that are not owned by HACA, and that which the City does inspect.

16.   As is the case with the Johnson family, throughout their entire period of residence, the Holliday family has had persistent mold growth throughout their apartment.

17.   Because the City chose to abandon the inspections requirement, the Housing Authority has elected to simply wipe the mold with a rag and paint over it on multiple occasions, without ever truly remediating it.

18.    Ms. Holliday and one of her children suffer from asthma that has been exacerbated by the persistent mold in their home.  As a result of the mold, she and her child have been treated for breathing issues and prescribed numerous medications to assist their breathing.

19.    Recently, the Holliday Family was advised by HACA officials that their apartment contains unsafe levels of lead.  HACA has known about the presence of lead for years, but because the HACA-owned rental properties were not inspected by the City, HACA was never required to provide lead certifications to the City.  The Holliday Family is just one of multiple families who were made aware of lead in their home and advised by HACA that their family was being forced to move to a new residence.

## Defendant

20.    Defendant City of Annapolis is a municipal corporation in the State of Maryland, Anne Arundel County.

## FACTS

21.    For the convenience of the Court and the Parties, the factual allegations of this Complaint are divided into two sections as follows: (1) Facts Similarly Alleged in the Case of *White, et al. v. City of Annapolis, et al.*, and (2) Facts Discovered Subsequent to Filing of *White, et al. v. City of Annapolis, et al.*  Furthermore, the allegations of fact found in *White, et al. v. City of Annapolis, et al.*,

which are, or could be construed as, material to the allegations of the present Complaint, are hereby incorporated.

**Facts Similarly Alleged in the Case of *White, et al. v. City of Annapolis, et al.***

### Historical Treatment of African Americans by the City of Annapolis

22.    Throughout its nearly 370-year history, Annapolis has been home to many people of African descent, some of them seeing it for the first time from the perch of the slave auction block that stained its bustling harbor.  Throughout its history, Annapolis has discriminated and continues to discriminate against African Americans as it relates to residential housing.  As was alleged in *White*, the Plaintiffs allege here that "the City's refusal to enforce the licensing and inspection requirements on HACA properties, and HACA's refusal to follow them, is discriminatory." *White v. City of Annapolis by & through City Council*, 439 F. Supp. 3d 522, 533 (D. Md. 2020).  Moreover, as was alleged in *White*, the Plaintiffs here allege that "in addition to the disparate impact, Annapolis' history supports an inference of intentional discrimination." *Id*.

### The HACA Properties

23.    HACA manages approximately 790 apartments spread over six (6) developments, which are home to approximately 1,600 residents:

> a. Bloomsbury Square – Rebuilt in 2003, this is HACA's newest property, and it consists of 51 units;

8

b.  Harbour House – Constructed in 1964, is comprised of 273 units;

c.  Eastport Terrace – Constructed in 1953, is HACA's oldest property and is comprised of 84 units.  Eastport Terrace and Harbor House share a property line, and the residents share the same recreational facilities;

d.  Morris H. Blum Senior Apartments – Constructed in 1976, are HACA's only dedicated units for the elderly and disabled, and require tenants be 55-years-old (or 50-years-old if disabled) to apply;

e.  Robinwood – Constructed in 1970 is comprised of 150 units; and

f.  Newtowne Twenty (or "Newtowne 20") – Constructed in 1971 was comprised of 78 units before its demolition in 2020.  It is in the process of redevelopment.

**Rental Unit License – A Requirement of the Annapolis City Code**

24.    In the early 1980s, the City of Annapolis began to place great emphasis on licenses and inspections of its rental properties.  In fact, after the City first began to enforce its rental inspection regime, it faced a backlash from private property owners who fought the rental inspections as violative of the state constitution.  In

response, the City sought and obtained emergency state legislation to remedy the constitutional deficiency. The remedy gave the City the express authority to charge a rental dwelling license fee of all rental properties in the City.

25.   During the relevant time period, Chapter 17.44.010 of the City Code stated:

> No person shall let for occupancy or use any vacant single rental dwelling unit, multiple dwelling, bed and breakfast home, roominghouse, or bargehouse without a current operating license issued by the Department of Planning and Zoning, after the application for the license has been approved by the Director of Planning and Zoning, with the concurrence of the Fire Chief, and the County Health Officer, for the specific named unit, multiple dwelling, bed and breakfast home, roominghouse, or bargehouse.

26.   During the relevant time period, Chapter 17.44.020 of the City Code stated:

> No operating license shall be issued or renewed unless the applicant owner first has made application on an application form provided by the Director of the Department of Planning and Zoning. The Director shall develop the forms and make them available to the public.

27.   Pursuant to this and other portions of the City Code, all rental units require a license issued by the City if they are to be legally authorized to operate.

28.   During the relevant time period, to obtain a license, rental units were required to be inspected and found to be in compliance with the City's Residential Property and Maintenance Code. Annapolis City Code, Chapter 17.44.010.

29.    During the relevant time period, HACA Properties managed solely by HACA were **neither licensed nor inspected** by the City.  These properties are the **only** rental properties within the City that were **neither licensed nor inspected**. They were not licensed because HACA did not comply with the City Code by applying for rental licenses for its properties, and it was the City's policy not to do anything about HACA's lack of compliance with the Code. The City Code was simply not enforced on the HACA Properties.

30.    Pursuant to policies of the City's Office of Licenses & Permits Division, when conditions that present a danger to health or safety are found in an apartment that is currently occupied by tenants, a landlord is required to relocate that tenant, remediate the danger, request a reinspection, and provide other proof at the landlord's expense to the City Inspector demonstrating the danger is no longer present.

31.    During the relevant time period, Chapter 17.44.130 of the City Code stated: "Upon suspension, revocation, denial, or expiration of a license, the director shall have the authority to cause notices to be posted on the property which shall state as follows: OCCUPANCY OF ANY DWELLING UNIT IN THIS BUILDING NOW VACANT OR BECOMING VACANT IS UNLAWFUL UNTIL A LICENSE TO OPERATE HAS BEEN OBTAINED AND IS DISPLAYED ON

THE PREMISES." During the relevant time period, no such postings were made by the City on the HACA Properties.

### The City's Notice of its Failure to Evenly Enforce its Code

32.    Rental licenses have been a requirement of prospective landlords by the City since approximately 1985. Despite the inspection requirement, the public housing units managed by HACA were rarely, if ever, subjected to any City inspections whatsoever; but they have never been fully, finally, or properly inspected and licensed in accordance with the City Code. The HACA Properties where the Named Plaintiffs Johnson and Holliday live were not fully licensed and inspected at any time relevant to this Complaint.

33.    Maryland Housing and Community Development Code § 12-403 states:

> Except as provided in § 12-506(b)(9) of this title, all housing projects of an authority are subject to the planning, zoning, sanitary, health, fire, housing, subdivision, and building laws, ordinances, codes, rules, and regulations that apply where the housing project is located.

34.    Maryland Housing and Community Development Code § 12-506(b)(9) states:

> To aid and cooperate in the planning, undertaking, construction, or operation of housing projects located wholly or partly in the area in which it may act, a State public body, with or without consideration and on terms that it determines, may … plan, replan, zone, or rezone any

part of the State public body, make exceptions to its
sanitary, building, housing, fire, health, subdivision, or
other similar laws, rules, regulations, and ordinances or
make any changes to its map or master plan….

**Rental License Application Process in the City of Annapolis**

35.    During the relevant time period, Chapter 17.44.060 (A) of the City

Code stated:

The operator of a multi-family dwelling consisting of fifty
or more units who employs a full-time maintenance staff
of three or more employees on-site shall have its license
initially issued or renewed for a two-year period. **All other
licenses shall be issued or renewed on an annual basis**.

(Emphasis added).

36.    All of HACA's 790 units – including those of Ms. Johnson and Ms.

Holliday – were required by law to be inspected and re-licensed by the City of

Annapolis annually.

37.    The Rental Operating License Application mandated by the City of

Annapolis states:

A property owner must obtain a license prior to operating a rental
facility within the City of Annapolis.  License application and
rental operating license are non-transferable. Application must
include fee of $100.00 per unit. ***Property must be inspected for
compliance of the City's Code and International Property
Maintenance Code before the license will be issued***.

38.    On May 1, 2016, the City began inspections of the HACA Properties.

This initial round of inspections was not completed until July or August 2016.  The

13

results of the inspections were abysmal.  Of the 790 units inspected there were **2,498** City Code violations uncovered by inspectors.

39.  Each of the six HACA Properties inspected lacked the "Electric Hardwired Smoke Detectors" required by City Code of **all** rental units.  Many of the battery powered smoke detectors required of HUD's lower inspection standard were not functioning.

40.  Many of the City Code violations presented dangers to health and safety.  Consistent with the City Code, the City **should have required HACA** to relocate tenants pending the correction of the dangerous conditions or to reimburse tenants for their costs related to securing adequate substitute housing.  Even after it conducted the initial inspections, the City did not enforce its own Code remedies for non-compliance with the City Code. Pursuant to the City Code, the City should have revoked the licenses or required the vacation of the HACA Properties and relocation of HACA tenants while affected units were brought into compliance with the Code. The City chose to do neither.

41.  After the initial inspection results were provided to HACA officials in the summer of 2016, the Housing Authority was provided with follow-up inspection dates for when the City would be back out for a second round of inspections.  Some follow-up inspections were conducted, but **none of the six HACA Properties were ever fully and properly licensed.**

42.   In February 2018 testimony before the City Council, then HACA Director Beverly Wilbourn stated that "We can't really have a strong housing authority without the full support of the City of Annapolis."

43.   Director Wilbourn then spoke about the various issues faced by HACA when it came to maintenance:

> **Let me be clear, I can't do maintenance. I can't get maintenance to get me away clear on properties that are 40, 50, in the case of Eastport Terrace 65 years old, and in need of major rehab**.  That is where redevelopment comes into play. And that is what we have RAD, that is what we have selected as the redevelopment tool… But the reality is, there is only so far we can get with maintenance.  At a point real estate needs some capital infusion, some major system rehabs, changing out, renewal, even the layouts need to be changed some. Obsolescence comes into play.  **And that's where we are with probably about five of our developments.**   And we are committed to taking that through so that we have in each of our communities, communities that all of us can be proud of.

(Emphasis added).

## Demographic Context and Disparate Impact

44.    The Housing Authority of the City of Annapolis has six low-income housing properties: Bloomsbury Square; Harbour House; Newtowne Twenty; Eastport Terrace; Robinwood; and Morris H. Blum Senior Apartments.  Morris H. Blum Senior Apartments is restricted to older and disabled persons.

45.   Racial composition of these low-income housing developments is not directly available from public sources, but the racial composition of the Census

block (the immediate neighborhood) where each property is located can be determined from the 2010 Census. The Census blocks for each of the six low-income housing properties are identified using the street addresses listed by the Housing Authority of the City of Annapolis. The Census Bureau's American FactFinder street address function identifies Census blocks based on street addresses.

46.     Five of the Housing Authority properties are located in majority Black Census blocks. Three of the Housing Authority properties (Bloomsbury Square, Newtowne Twenty, and Robinwood) are in blocks where **more than 90% of residents are Black**. Whites comprise 58.9% of the residents in the block where the Morris H. Blum Senior Apartments is located, 16.3% of the residents are Black and 21.3% of the residents are Latino.[1] Blum is the only Housing Authority property designated for seniors and disabled people, and it is the only Housing Authority property located in a majority White Census block.

47.     The six Housing Authority properties are in blocks where Blacks comprise 67.5% of the residents, Whites comprise 22.6% of the residents, and Latinos comprise 5.7% of the residents. In contrast, in the City of Annapolis as a whole, Whites accounted for 53.5% of residents, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents. Residents of the six

---

[1] White refers to Non-Hispanic Whites.

Housing Authority properties are disproportionately Black.  The proportion of Black residents in these properties is 2.6 times greater than the proportion of Black residents in the City of Annapolis.

48.   The five Housing Authority properties **not** designated as senior and disabled housing are in blocks where Blacks comprise 71.5% of the residents, Whites comprise 19.7% of the residents, and Latinos comprise 4.4% of the residents. As noted above, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents.  Residents of the five Housing Authority properties not designated as senior housing are disproportionately Black.  The proportion of Black residents in the neighborhoods where these properties are located is 2.8 times greater than the proportion of Black residents in the City of Annapolis.

49.   *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019* identifies the racial distribution of residents in the public housing properties.  Of the 831 public housing units,[2] 759 (91.3%) were identified as occupied by Blacks and 58 (7.0%) were occupied by

---

[2]  This figure of 831 public housing units references the additional HACA units which are located outside of the HACA managed properties in other public/private developments, and incipiently, are inspected by the City.

Whites.[3]  A separate table reports 20 Hispanic residents.[4]  The race of the Hispanic residents is not reported.  This report was submitted in May 2015, so these numbers presumably represent the public housing population in 2015.    In 2010, Whites accounted for 53.5% of residents in the City of Annapolis, Blacks accounted for 25.7% of residents, and Latinos accounted for 16.8% of residents.  Based on the City's report and the 2010 Census data, the proportion of Black residents in these properties is 3.6 times greater than the proportion of Black residents in the City of Annapolis.

## Facts Learned Subsequent to Filing of *White, et al. v. City of Annapolis, et al.*

50.    Allegations contained in the case of *White, et al. v. City of Annapolis, et al.* which related to the agreement between the City and the Housing Authority to no longer enforce the City Code on the HACA Properties were, at the time, based upon information and belief.  However, upon filing of the complaint in that case, various members of the public came forward with information, including documents, which certified those allegations of agreement, policy, and conspiracy.  The present allegations are based upon undisputed facts.

---

[3] Table 24, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

[4] Table 25, *The City of Annapolis Five Year Consolidated Housing and Community Development Plan Federal Fiscal Year 2015-2019.*

**Executive Director Wilbourn and Mayor Buckley Entered an Agreement to Cease City Inspections of the HACA Properties**

51.    In June 2017 newly appointed Director Wilbourn issued her Executive Director's Report for June 2017.  Director Wilbourn identified the City inspections of the HACA Properties as a hurdle to her success in balancing the HACA budget stating:

> A major assumption to remain within FY 2018 budget pertains to the City of Annapolis **working with** HACA regarding City ordered inspections, repairs and upgrades on HACA property. HACA has experienced unsustainable maintenance overtime, delays in unit turnover, defer [sic] maintenance actions, imposition of fees to the City, and unrealistic deadlines to meet City inspection mandates. **The current relationship with the City cannot continue** if HACA is to achieve its priority of maximizing housing opportunities. I will meet with the City Administrative [sic] this week to discuss the decreased housing opportunities and increased cost overruns caused by the City **unfunded mandates**.

(emphasis added).

52.    Director Wilbourn interpreted the state and city code statutes which require inspections of the HACA Properties – inspections conducted to ensure the health and safety of the occupants – by the City to be "unfunded mandates," on the Housing Authority.  It was Wilbourn's view that a major assumption of the FY 2018 budget required the City of Annapolis to "work" with HACA regarding the City-ordered inspections, repairs, and upgrades on the HACA Properties. The Executive

19

Director went so far as to say that the "current relationship" – one where the City conducted inspections of the HACA Properties – "cannot continue."

53.    In July 2017, via email, Mary Emrick, a Senior City Inspector, requested that Director Wilbourn advise when the City might receive HACA's next round of applications for license renewals, a logistical step which would have begun the next round of HACA Property inspections.  Director Wilbourn forwarded that email correspondence along to HACA Board Member John Dillon.  In that forward, she advised that she had discussed the inspections with the City Manager Thomas Andrews and relayed to Dillon that her understanding from her conversation with the City Manager was that the City would "work out an agreement going forward on the inspections," but that apparently because Mr. Andrews was out of town on vacation the inspections were being scheduled.

54.    In her email, Director Wilbourn advised that if the issue could not be worked out, she would refer the matter to HACA's attorneys, an action which was interpreted by members of the HACA Board, in a subsequent email, to mean that Director Wilbourn was in favor of bringing suit against the City of Annapolis to prevent inspections of HACA Properties if the City insisted on inspecting the properties.

55.    On approximately August 30, 2017, having apparently failed to reach an agreement regarding the inspections, Mary Emrick was advised by Director

Wilbourn that "the city is to not do any inspection until [Director Wilbourn] speaks with the board."

56.    Upon receipt of that correspondence, then Mayor Pantelides countered: "**This is not acceptable!** In our meeting last week we agreed the inspections would move forward. **Why is she fighting against everyone being treated the same? We are trying to improve their quality of life.**" (emphasis added).

57.    On approximately September 8, 2017, Director Wilbourn drafted a document titled "Status Report on Scope of Work identified in Employment Agreement." This document reflects Director Wilbourn's assessment of her actions to date as HACA Director in terms of various line items which had been included under the "Scope of Work" in her Employment Contract. In response to one line item in the scope of work, Director Wilbourn stated:

> Unsuccessfully worked to redefine relationship between HACA and Mayor's office. Unsuccessfully sought City consensus to move from City inspections to REAC inspections, for sustainability, HUD compliance and avoiding unintended liabilities to HACA.

In the final line of the draft, and in response to the line item entitled, "Exercise authority to function and take actions deemed necessary to execute Scope of Work," Director Wilbourn provided the following: "**Executive Director's authority is continually undermined by Board members and City**." (emphasis added). Director Wilbourn apparently believed that the City was undermining her ability to

perform her job by enforcing the state and city code on HACA as a landlord in Annapolis.

58.   City elections were held November 7, 2017.  Mayor Pantelides, who had emphasized during his reelection campaign that he was the "First Mayor to Inspect Public Housing," was unseated by Gavin Buckley.  However, Mr. Buckley would not be sworn in as mayor until the following month.

59.   In November 2017, Director Wilbourn was in the process of negotiating her contract of employment with HACA.  In response to an email regarding the contract negotiation, and highlighting a lack of language within the contract, HACA Board Member Kimberly Cornett pointed out the following: "Largely this looks fine but [I] did want to note that it is silent on the expectations of the Executive Director vis a vis the City inspections which have been an issue between Beverly [Wilbourn] and the Board."  With the mandated city inspections still a City requirement of the Pantelides administration, and the apparent concern that the Board did not believe Director Wilbourn would follow their decisions regarding the inspections, Board Chairwoman Sandra Chapman responded on November 20, 2017 as follows:

> I would also like to remind you that the City not the board took action on setting up the City inspections. No, it is not a concern that Beverly isn't going to listen to the board on this matter. **Her and I have spoken about improving relationships with the City, and <u>she has already met with our incoming Mayor about this and the inspections</u>**.

(emphasis added).  Then Mayor-elect Buckley had not yet been sworn into office on the day this email was sent. Mayor-Elect Buckley and Director Wilbourn entered their agreement to stop inspections of the HACA Properties prior to Mr. Buckley even having taken the oath of office.

### The Mayor, the City of Annapolis Office of Law, and the Housing Authority Worked Together to Try to Evict a HACA Tenant and Formalize the City's Policy of Non-Enforcement of the City Code on the HACA Properties

60.    During approximately the first year and a half of Mayor Buckley's administration – December 2017 through May 2019 – the only evidence of the City's new policy of non-enforcement of the City Code on the HACA Properties were representations to members of the public made by members of the City's Office of Planning and Zoning.  Those representations came about when HACA residents called to complain about issues related to their HACA apartments.  Representatives from that office explained that the City no longer inspected the HACA Properties.

61.    On March 27, 2019, HACA resident Ladawn Camp was sued by the Housing Authority in the case of *Housing Authority of the City of Annapolis v. LaDawn Camp*, Anne Arundel County District Court Case No. D-071-LT-19-001816.  The case was filed for alleged failure to pay rent.  In her defense, she raised the fact that she had paid rent and that HACA was mistaken.  However, she also brought to the attention of the district court the fact that HACA was not even licensed

23

by the City to rent their properties, and therefore, pursuant to Maryland law, it was legally foreclosed from filing summary ejectment actions in landlord/tenant court.

62.   In an effort to undermine Ms. Camp's defense, HACA and the City worked together to prosecute her eviction.

63.   In an April 26, 2019 email from a HACA attorney to an Assistant City Attorney, HACA forwarded a draft affidavit for the signature of City Manager Teresa Sutherland.  HACA's attorney went on to express that "HACA needs the assistance of the City, as discussed."  To that end, HACA's attorney stated: **"It would be terrible for HACA and the City if HACA was prohibited from collecting rent because it has no licenses for its units."**

64.   On May 9, 2019, in a follow-up email from HACA's attorney to the City Attorney, the HACA attorney explained that HACA Executive Director Wilbourn would be calling Mayor Buckley that day to discuss with the Mayor his preparation of a potential witness from the City for the May 14, 2019 hearing.  That witness was to be the City's Chief of Code Enforcement.  In that email, HACA's attorney also inquired further into the status of the affidavit.

65.   The following day, May 10, 2019, the City Manager executed an affidavit which reduced to writing the City's non-inspection policy of the HACA Properties.  Under oath, she swore that "no City inspections or licenses are required for HACA to operate its properties lawfully."  This document reflects that as of that

date – May 10, 2019 – the City's stated policy was specifically not to require HACA's compliance with the City Code.  Pursuant to City policy, HACA properties were not required to be inspected or licensed by the City.

66.    At the May 14, 2019 hearing in *HACA v. Camp*, the City's Chief of Code Enforcement testified after his preparation by Mayor Buckley that it was in fact Mayor Buckley who decided to exempt HACA from the City's licensing requirement.   After the hearing, HACA's attorney emailed the City's Chief of Code Enforcement to thank him for testifying on HACA's behalf.  In that email, he copied the following individuals: the City Attorney, the City Manager, Mayor Buckley, and Executive Director Wilbourn.

67.    On May 16, 2019, plaintiffs in the case of *White, et al. v. City of Annapolis, et al.*, Civil Action No. 1:19-cv-01442-CCB, filed suit in the U.S. District Court for the District of Maryland.  In that lawsuit plaintiffs alleged that the City had discriminated against residents of public housing through their jointly agreed upon non-inspection policy as it related to the HACA Properties.

**The City and HACA's Joint Policy of Separate and Unequal Inspections – the "Shadow Policy"**

68.    Upon filing of the *White* lawsuit, the Mayor and City Council took swift public-facing actions to correct their plainly discriminatory policy which had been brought to light in the complaint.

69.    On June 10, 2019, less than a month after the lawsuit was filed and before it was even served on the City, the Mayor and City Council of Annapolis unanimously adopted R-26-19, which resolved that "the City of Annapolis [would once again] begin inspecting HACA units under the City's rental licensing program."  Yet despite this resolution, the illegal and blatantly violative conduct continued.  Despite the adoption of Resolution R-26-19 and its representation that the Mayor and City Council would begin to treat Housing Authority tenants equally with those citizens who lived in all other rental properties in the City, both City and HACA officials continued behind the scenes to work together to discriminate directly against the tenants of the HACA Properties, including the Named Plaintiffs.

70.    Despite the resolution, officials from the City and the Housing Authority conspired further to treat the tenants of the HACA Properties differently. On approximately June 28, 2019, the City and HACA agreed to implement a Shadow Policy to conduct inspections on Housing Authority units **differently** than all other rental units throughout the City.  In an email from City Manager Teresa Sutherland to HACA Executive Director Beverly Wilbourn, the City Manager outlined ways in which the City would circumvent the requirements of R-26-19 through "waivers" and "grandfathering old violations" in the following ways:

a. Inspections would be for life safety issues **only**, with the exception of the requirement for hard-wired smoke detectors, which the City agreed to waive.

b. Hard-wired smoke detectors are required in all City rental properties. However, the City waived this requirement for the HACA properties. Instead, unlike all other rental properties in the City, the HACA Properties would be allowed to use battery operated smoke detectors.

c. The City and HACA agreed that the City would not deny a license for a unit for deficiencies in routine maintenance, but would simply note the violations, consider waivers up to one year, and issue the license despite the violations.

d. Disturbingly, the City and HACA agreed that the City might not even withhold a license for "structural or mechanical defects." Rather, whether structural or mechanical defects would result in HACA being denied a license would be decided on a case-by-case basis; the City might consider waivers even for those significant issues.

71. The City and HACA's agreement to the issuance of a one-year waiver for deficiencies in routine maintenance amounted to a complete waiver of "routine

maintenance" violations since the term of a license was one year under the City Code.  In effect, this Shadow Policy gutted R-26-19, while the HACA residents and citizens of Annapolis were otherwise left to believe that the City was carrying out the law as represented.

72.    Further, the City's 2019 and early 2020 inspections of the HACA Properties which were conducted under the auspices of R-26-19 failed to note many of the very same types of "routine maintenance" violations that had surfaced in the 2016 inspections.  The types of items for which HACA could receive a "waiver" included, among others, the following:

a.  Chipping paint on walls

b.  Rodent infestations

c.  Defective doorknobs at the entrance to apartments

d.  Inoperable vent fans (which reduce moisture and prevent mold growth)

e.  Broken light fixtures

f.  Defective and broken countertops

g.  Holes in doors and walls

h.  Missing bathroom fixtures

i.  Missing window screens in buildings that did not have air conditioning

73.     In practice, the Shadow Policy agreed upon by the City and HACA resulted in the City's inspectors plainly ignoring numerous routine maintenance failures that would have been enforced as violations had they been encountered by City inspectors at any other rental property in the City.

74.     As a November 7, 2019 inspection report on the Morris Blum Senior Living Building demonstrates, the City scheduled re-inspections only for "Life Safety" and "Structural and Infestation" violations.

75.     Another inspection in January 2020 inexplicably contained only "Life Safety" and "Structural, Plumbing, Elec" violations and made no effort to even identify the "routine maintenance" failures.

76.     The Shadow Policy continued the City's separate, unequal inspections for Housing Authority units, treating Housing Authority tenants as second-class citizens, not deserving of the same standards of housing as tenants in private rental properties in the City.

77.     The Shadow Policy allowed the City and HACA to intentionally treat the tenants of the HACA Properties differently than tenants who live just across or down the street from a neighbor who lives in a property that is not a HACA Property. HACA not fully complying with City Code and the City applying different, lesser standards to HACA properties in response, is just one further example of how the City and HACA partnered to further perpetuate segregation in the City of Annapolis.

29

Their partnership operated to the detriment of the Named Plaintiffs' lives, health, and safety as well as the life, health, and safety of all other residents of HACA properties.

## CLASS ALLEGATIONS

78.   The Named Plaintiffs file this case as a class action pursuant to FRCP 23.  The Class is defined as:

> All individuals now living who are or previously were tenants in Housing Authority properties within the two years immediately preceding the filing of the complaint.

79.   Excluded from the class are (i) any of the individual Plaintiffs from *White v. City of Annapolis*, Civil Action No. CCB-19-1442; (ii) any employee or independent contractor of the Defendants; (iii) any relative of an employee or independent contractor of the Defendants; (iv) any employee of the Court where this action is pending, or (v) any person who filed for bankruptcy and received a discharge after ceasing to be a resident in a HACA property.

80.   The definition of the class is subject to amendment.

81.   **Ascertainability.** The class members are readily ascertainable from the housing records which are in the possession of the Defendant, HACA, or either of their affiliated entities and agents.

82.   **FRCP 23(a)(1).   Numerosity.** The members of the class are so numerous that joinder of all members is impracticable. At all material times there

30

were approximately 790 HACA leased units, housing approximately 1,600 individuals. Defendant treated all tenants in these units similarly, in that it had a policy of non-inspection or non-enforcement with respect to all Housing Authority units. Therefore, all individual tenants in Housing Authority units are likely to be members of the class.

83.    **FRCP 23(a)(2). Common Questions.** There are common questions of fact and law which predominate over any questions affecting only individual members. The common questions of law and fact include:

a.  Whether Defendant had a policy to not inspect the HACA Properties on the same basis as non-HACA Properties;

b.  Whether Defendant had a policy of failing to enforce City housing code violations at the HACA Properties on the same basis as similar violations at non-HACA Properties;

c.  Whether Defendant's discriminatory policies violated the Class's rights under Federal and state constitutional and statutory law.

84.    **FRCP 23(a)(3). Typicality.** Plaintiffs' claims are typical and are the same or identical to the claims of individual members of the class and are based on the same facts and legal theories. The Defendant's defenses are likely to be similar for Plaintiffs as for the members of the class.

85. **FRCP 23(a)(4).   Adequacy.** The Named Plaintiffs will fairly and adequately protect the interests of the class members in the prosecution of this action. They are similarly situated with, and have suffered the same harms and injury as the class members that they seek to represent.

86. The Named Plaintiffs have retained counsel experienced in class action litigation, and specifically in the facts and law involved in this case insofar as this case is a follow-on to the *White* case.

87. None of Plaintiffs' counsel have interests which might prevent them from actively and vigorously pursuing this action.

88. Plaintiffs do not have any conflicts of interest that would interfere with their ability to represent the interest of the members of the class.

89. **FRCP 23(b)(2).** The City of Annapolis has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

90. **FRCP 23(b)(3).   Predominance and Superiority**. Questions of law or fact common to the class members predominate over questions affecting only individual members.  In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy, for the following reasons:

> a. Because the basic facts and legal theories are all the same, there is no need or ability for each class member to

individually control the prosecution in separate actions. Individual litigation of the claims by separate class members would be inefficient and waste judicial resources, requiring repeated litigation of the common issues.

b. There is no existing litigation concerning the controversy already begun by or against class members. (The *White* case (1:19-cv-01442-CCB) and the *DaMon Fisher* case (1:21-cv-01074-GLR) do not involve members of this proposed class).

c. Concentrating the litigation in this forum is desirable because this is the home forum for both Defendant and the class, and this court has the benefit of having dealt with the previous individual action, *White*.

d. Difficulties in managing the class are unlikely: the class consists of a large but manageable number of individuals whose identities are readily ascertainable from the HACA's records.

## COUNT I
## (Violation of Fair Housing Act, 42 U.S.C. § 3601 *et seq.*)

91.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

92.   Defendant's policy of non-enforcement of the City Code on the HACA Properties constitutes a violation of the Fair Housing Act, 42 U.S.C. §3604 *et seq.*, which makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

93.   Defendant's facially neutral housing acts, policies, and actions challenged herein inflicted disproportionate harm on Named Plaintiffs and members of the class.   The disproportionate harm experienced is the direct and immediate consequence of the Defendant's policy of non-enforcement of the City Code on the HACA Properties.

94.   As a result of Defendant's acts, Named Plaintiffs and members of the class were denied the opportunity to live in safe rental housing inspected by the City of Annapolis on an annual basis, a right they would have enjoyed if they had lived in any other rental property in the City that was not managed by the Housing Authority.

95.    Defendant's acts, policies, and practices constitute discrimination in violation of the Fair Housing Act, as amended, 42 U.S.C. §3604, and its implementing regulations, in that:

a.  Defendant's acts, policies, and practices have made and continue to make housing unavailable because of race in violation of 42 U.S.C. §3604(a). Specifically, HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development." 24 C.F.R. § 100.70(a). Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin . . . of persons in a community, neighborhood or development." 24 C.F.R. § 100.70(c)(1); and

b.  Defendant's acts, policies, and practices provide different terms, conditions, and privileges of rental housing on the basis of race, in violation of 42 U.S.C. § 3604(b). Specifically, HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" and "[l]imiting

the use of privileges, services or facilities associated with a dwelling" because of race or national origin. 24 C.F.R. § 100.65.

96.    Additionally, Defendant's acts, policies, and practices perpetuate segregation in violation of the Fair Housing Act which is prohibited.  HUD's regulations implementing the Fair Housing Act state that "[a] practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race[.]"  24 C.F.R. § 100.500(a).

97.    The Named Plaintiffs and members of the class are aggrieved persons as defined in 42 U.S.C. § 3602 (d) and (i) and have been injured by Defendants' discriminatory conduct defined by 42 U.S.C. § 3602(f).

98.    As a result of these violations, the Named Plaintiffs and members of the class have been injured.

### COUNT II
### (Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982)

99.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

100. Defendant's discriminatory practices, made in reckless or callous indifference or disregard for the rights of the Named Plaintiffs and members of the class deprived them of their right to purchase, lease, or otherwise hold or convey property on the basis of race, color, and national origin and thus deprive them of the

same such rights as are enjoyed by White persons in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982.

101.  Named Plaintiff Holliday and her family as well as other members of the class have been forced out of their home due to the discovery of lead in their apartments.

102.  As a result of these violations, the Named Plaintiffs and members of the class have been injured.

**COUNT III**
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**

103.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

104.  Defendant's discriminatory customs, patterns, practices, and usages in contravention of constitutional and federal statutory rights made in reckless or callous indifference or disregard for the rights of Named Plaintiffs and members of the class, did deprive them of their right of equal access to housing under color of law in violation of the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and their rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution with regard to housing.

105.  As a result of these violations, the Named Plaintiffs and members of the class have been injured.

## COUNT IV
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985 Section 3 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**

106.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

107.  Defendants conspired with discriminatory purpose to deprive either directly or indirectly the rights of the Named Plaintiffs and members of the class, all of whom are a member of a protected class, to equal protection of the laws or equal privileges and immunities under the laws, and one or more of the Defendant conspirators did or caused to be done acts in furtherance of the object of the conspiracy, and the Named Plaintiffs and members of the class were injured in person or property or deprived of having and exercising their rights as citizens of the United States.

108.  As a result of these violations, the Named Plaintiffs and members of the class have been injured.

## COUNT V
**(Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States)**

109.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

110.  Defendant, its employees, and its agents were in a position of power and knowledge of the conspiracy to deprive the Named Plaintiffs and members of the class of their rights in violation of 42 U.S.C. § 1985.

111.  Defendant was on notice through City Council meetings, both open and closed to the public, as well as communications between the Mayor, City Council, the Executive Director, and Housing Authority officials, that the City had an obligation to inspect the HACA Properties and that the Housing Authority had an obligation to comply with those inspections.  Despite these obligations, the City and Housing Authority agreed to a policy not to inspect the HACA Properties to the same standard of all other rental properties in the City.   In continued refusal of enforcement of City Code, and despite notice of that obligation, Defendant failed to uphold their duty to ensure the health and safety of the Named Plaintiffs and members of the class, whose civil rights were violated as a result.

112.  As a result of these violations, the Named Plaintiffs and members of the class have been injured.

**COUNT VI**
**(Violation of the Maryland State Constitution – Article 24 of the Maryland Declaration of Rights)**

113.  Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

114. The Defendant, by its acts, have acted under color of law and have violated Article 24 of the Declaration of Rights of the Maryland State Constitution, (1) by discriminating against the Named Plaintiffs and members of the class, and (2) by treating them on less than equal terms as those similarly situated tenants in the City of Annapolis who are not tenants of public housing.

115. Defendant's discriminatory customs, patterns, practices, and usages in contravention of the constitutional rights of the Named Plaintiffs and members of the class made in reckless or callous indifference or disregard for the rights of them, did deprive the Named Plaintiffs and members of the class of their right of equal access to housing under color of law in violation of Article 24 of the Maryland Declaration of Rights with regard to housing.

116. As a result of these violations, the Named Plaintiffs and members of the class have been injured.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs pray that the Court grant them the following relief for themselves and for members of the class:

        A.    For an Order certifying this case as a class action;

        B.    The Court should issue an order granting Plaintiffs' request for declaratory relief, finding that the Defendants' actions violated the FHA;

        C.    Compensatory damages in excess of $75,000 for the deprivation of the civil rights of Named Plaintiffs and members of the class;

        D.    Appropriate equitable relief pursuant to federal and state law;

        E.    The Court should award Plaintiffs their reasonable attorneys' fees, costs, and expenses.

        F.    The Court should grant such other relief as it deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues in this case.

**THE DONAHUE LAW FIRM, LLC**


By:    /s/ *P. Joseph Donahue*
          P. Joseph Donahue, Esquire
          Bar Number: 06245
          18 West Street
          Annapolis, Maryland 21401
          Telephone: 410-280-2023
          Fax: 410-280-0905
          Email: pjd@thedonahuelawfirm.com

**THE HOLLAND LAW FIRM, P.C.**

/s/ *Peter A. Holland*
Peter A. Holland
Fed. Bar No. 10866
914 Bay Ridge Rd. Ste 230
Annapolis, MD 21403
Telephone: (410) 280-6133
Facsimile: (410) 280-8650
peter@hollandlawfirm.com

/s/ *Emanwel J. Turnbull*
Emanwel J. Turnbull
Fed. Bar No. 19674
914 Bay Ridge Rd, Ste 230
Annapolis, MD 21403
Telephone: (410) 280-6133
Facsimile: (410) 280-8650
eturnbull@hollandlawfirm.com

*Counsel for Plaintiffs*