IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TAMARA JOHNSON, *et al.*<br><br>v.<br><br>CITY OF ANNAPOLIS | Civil Action No. CCB-21-1120 |

## MEMORANDUM

Now pending is a motion to dismiss (or, in the alternative, for summary judgment) in a class action against the City of Annapolis ("the City").[1] The case concerns a longstanding City policy of not inspecting and licensing public housing in Annapolis. *Johnson* is a putative class action brought by Annapolis public housing residents who argue that the City's non-inspection policy violated their civil rights and had a disparate impact on African Americans; they allege violations of the Fair Housing Act, federal civil rights laws, and state constitutional rights.

The City moved to dismiss or for summary judgment in *Johnson* (ECF 8, response at ECF 9; reply at ECF 12; surreply at ECF 18). The matter has been fully briefed, and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons discussed herein, the court will deny the City's motion.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikipedia Pound. v.*

---

[1] Another case before the court, *Fisher v. City of Annapolis et al.*, CCB-21-1074, featured similar briefing and is being decided separately but with substantially similar reasoning.

1

*Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

The *Johnson* lawsuit follows the events of *White v. City of Annapolis*, No. CCB-19-1442, a 2019 case before this court in which 52 Annapolis public housing residents sued the City and the Housing Authority of the City of Annapolis (HACA) under a variety of federal and state causes of action. The *White* plaintiffs alleged that the City's decision not to enforce inspection and licensing requirements on public housing disparately impacted African Americans and was discriminatory. At the case's conclusion, the parties entered into a consent decree (ECF 98 in CCB-19-1442) enacting a number of prospective equitable remedies intended to improve public housing, as well as paying monetary damages for the plaintiffs.

### Public Housing Licensing and Inspections in Annapolis

The Annapolis City Code requires rental units to have operating licenses. (Annapolis City Code, Chapter 17.44.010). To obtain an operating license, the rental units must be inspected and in compliance with the City's Residential Property and Maintenance Code. (*Id.* 17.44.030 et seq.; ECF 1 ¶¶ 25–28). Landlords must pay a fee to obtain a license or a license renewal. (Annapolis City Code, Chapter 17.44.040(A); see ECF 1 ¶ 37). For many years, however, the City did not require inspections and licensing of HACA properties; such properties were the only rental properties in Annapolis that are neither licensed nor inspected. (ECF 1 ¶ 29). This apparently was a longstanding arrangement, as although rental licenses have been required of landlords since approximately 1985, HACA housing units had "have never all been fully, finally, or properly inspected and licensed in accordance with the City Code." (ECF 1 ¶ 32).

According to the plaintiffs, Annapolis has a troubled history of racism against African Americans and people of African descent, including through discriminatory residential housing policies. (ECF 1 ¶ 22). The *Johnson* plaintiffs allege that the City's policies around licensing and

2

inspecting Annapolis public housing is an instance of that discrimination and has a disparate impact on African Americans. (ECF 1 ¶ 22). HACA manages about 790 units housing about 1,600 residents, spread over six public housing developments. (ECF 1 ¶ 22). Named plaintiff Tamara Johnson lived in Harbor House, and fellow named plaintiff Tyonna Holliday lived in Eastport Terrace. (ECF 1 ¶¶ 4, 12). Census data suggest that these developments (except for one designated for seniors and people with disabilities) house a significant-majority African-American population. (ECF 1 ¶¶ 44–49).

The Annapolis City Code requires that rental units be licensed annually by the City, and units must be inspected and found compliant with the City's maintenance code to obtain a license. (ECF 1 ¶¶ 25–28; 35–37). When an inspector finds conditions dangerous to health or safety, the landlord must relocate the tenant, remediate the danger, request a reinspection, and provide other proof to the City inspector that the danger is no longer present. (ECF 1 ¶ 30). Annapolis has, since the early 1980s, emphasized the important of licenses and inspections and went so far as to obtain emergency state legislation to protect its regime from challengers who wished to evade the requirements. (ECF 1 ¶ 24).

But leading up to the *White* suit, HACA properties managed solely by HACA were unique among Annapolis rentals in that they were neither licensed nor inspected by the City. (ECF 1 ¶ 29). HACA did not apply for licenses in compliance with the City Code, and the City did not act on this non-compliance. (ECF 1 ¶ 29). State law also required that a housing authority's housing projects are subject to the regulations applicable in that location, except that a State public body may make exceptions to those regulations for a housing authority. (ECF 1 ¶¶ 33–34).

**2016 first inspections, 2017 non-inspection regime, 2019 Shadow Policy**

On May 1, 2016, under Mayor Mike Pantelides, the City began an initial round of inspections of the HACA properties, revealing 2,498 City Code violations, many of which presented dangers to health and safety and should have required relocation. (ECF 1 ¶¶ 38–40). After that summer, the City conducted some follow-up inspections, but no HACA property was fully and properly licensed. (ECF 1 ¶ 41). In 2017, newly appointed HACA Director Beverly Wilbourn identified City inspections as a hurdle to her success in balancing the HACA budget and interpreted the City's inspection requirements as "unfunded mandates." (ECF 1 ¶¶ 51–52). In summer 2017, Wilbourn advised a HACA board member that she had reached an understanding with the City Manager that the City would work out an alternative agreement on inspections, ultimately ordering a halt of all inspections starting in late August 2017. (ECF 1 ¶ 53). Then-Mayor Pantelides, an advocate of inspecting public housing, expressed frustration at HACA's resistance to treating public housing properties the same as private rental units. (ECF 1 ¶ 56).

But Annapolis would soon return to not inspecting public housing. Mayor Pantelides was defeated a few months later in the November 2017 city election; even before new Mayor Gavin Buckley was seated, Wilbourn had discussed the inspection issue with him, with the City and HACA agreeing to stop inspections of HACA properties. (ECF 1 ¶ 59). The only public evidence of the December 2017–May 2019 return to a non-inspection regime came when HACA residents called the City to complain about issues in their apartments, and representatives explained that the City no longer inspected the HACA properties. (ECF 1 ¶ 60). In mid-May 2019, HACA and the City were involved in a lawsuit against a HACA tenant, and at a hearing in the case, a city inspection worker testified that Mayor Buckley had decided to exempt HACA from the City's licensing requirement; afterward, HACA's attorney sent an email thanking that employee for his

4

testimony on HACA's behalf and copying city officials, Mayor Buckley, and HACA Director Wilbourn. (ECF 1 ¶ 66).

Two days later, the *White* plaintiffs filed their suit, triggering swift, public-facing commitments from the City government to adopt a June 2019 resolution that would restart HACA inspections and licensing. (ECF 1 ¶ 67–68). Despite this resolution, HACA and City officials together developed a policy — called the "Shadow Policy" by the *Johnson* plaintiffs — to conduct HACA inspections and licensing differently from other Annapolis rentals, for example: awarding waivers and grandfathering old violations; inspecting for life safety issues only; not denying licenses for deficiencies in routine maintenance. (ECF 1 ¶ 69). The plaintiffs allege that this gutted the June 2019 City resolution restarting inspections and allowed the City and HACA to intentionally treat HACA tenants differently from similarly situated non-HACA Annapolis renters, perpetuating segregation and hurting the plaintiffs' life, health, and safety (ECF 1 ¶ 72, 76, 77).

**Johnson**

The *Johnson* suit is a putative class action suit defining the class as "[a]ll individuals now living or who are or previously were tenants in Housing Authority properties within the two years" after May 7, 2019, excluding the *White* plaintiffs and a few other categories. (ECF 1 ¶¶ 78, 79).

The first named plaintiff, Tamara Johnson, is an African American woman who lives in Harbour House with her children; her home had never been inspected between her 2017 move-in and the 2021 filing of the lawsuit. (ECF 1 ¶¶ 4–5). The Johnsons deal with sewage leaks, wooden plywood floors in the bathroom after the tile cracked, rodent infestations, and mold growth; Johnson's daughter suffers from respiratory issues. (ECF 1 ¶¶ 5–11).

5

The second named plaintiff, Tyonna Holliday, is an African American woman who lives in Eastport Terrace with her children. (ECF 1 ¶ 12). Her unit has never been inspected during her residence there, from 2016 until at least the filing of the lawsuit. (ECF 1 ¶ 14). The Holliday unit likewise suffers with mold growth, which HACA dealt with by wiping it with a rag and painting over it. (ECF 1 ¶ 17). Holliday and one of her children suffer from asthma and breathing issues worsened by the mold. (ECF 1 ¶ 18). HACA officials also told Holliday that her apartment contains unsafe levels of lead. (ECF 1 ¶ 19).

The suit brings the following counts against the City:

- Count I: Violation of Fair Housing Act (ECF 1 ¶¶ 91–98)
- Count II: Violation of Civil Rights Act of 1866, 42 U.S.C. § 1982 (ECF 1 ¶¶ 99–102)
- Count III: Violation of Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States (ECF 1 ¶¶ 103–05)
- Count IV: Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985 Section 3, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States (ECF 1 ¶¶ 106–08)
- Count V: Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986, and the Equal Protection Clause of the Fourteenth Amendment (ECF 1 ¶¶ 109–12)
- Count VI: Violation of the Maryland State Constitution – Article 24 of the Maryland Declaration of Rights (ECF 1 ¶¶ 113–16)

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the

line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

The City makes three arguments in its motion to dismiss *Johnson*. First, the City argues that the *Johnson* class's claims are precluded as res judicata. Second, the City argues that the *Johnson* suit fails to include indispensable parties, including the *White* plaintiffs, plaintiffs' counsel, HACA, and the federal housing department. Finally, the City argues that these suits are impermissible collateral attacks on the *White* consent decree. In addition to these three main arguments, the City accuses plaintiffs' counsel of unethical conduct, accusations this court declines to entertain because they are meritless.[2] All arguments fail, and the City's motion to dismiss the *Johnson* suit will be denied.

**I.   Res Judicata**

The Fourth Circuit has laid out the law of claim preclusion as follows:

> "Under the doctrine of res judicata, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir.2004) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). Three elements must be satisfied for res judicata to apply. "[T]here must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Id.* at 354–55. Along with these "three formal elements" of res judicata, "two practical considerations should be taken into

---

[2] The City also threatened to file a third-party complaint against each of the 52 *White* plaintiffs and their attorney (who is also counsel in this case). This threat is wholly unjustified, and the court declines to consider it further.

> account." *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir.2003). First, we consider whether the party or its privy knew or should have known of its claims at the time of the first action. *See id.* at 473–74. Second, we ask whether the court that ruled in the first suit was an effective forum to litigate the relevant claims. *See id.* at 474.

*Providence Hall Associates Limited Partnership v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016).

The City's argument as to claim preclusion is meritless. While the *Johnson* plaintiffs benefit from the prospective injunctive relief laid out in the *White* Consent Decree, they did not receive a single cent of the $900,000 in compensatory damages awarded to the *White* plaintiffs. Nor were the *White* plaintiffs obligated to share those damages with any of the *Johnson* plaintiffs; those damages went specifically to the *White* plaintiffs in exchange for their release of their claims. *White* Consent Decree, No. 19-cv-1442, ECF 98 ¶ 42. The *White* plaintiffs were not in privity with the *Johnson* plaintiffs, and the *White* suit was not a class action with all the attendant class certification procedural safeguards.

The City also looks to the text of the consent decree, arguing that it covers "The Plaintiffs, past and present residents of public housing" and therefore that the *Johnson* plaintiffs have no standing to bring their own claims but instead may only seek enforcement of the Consent Decree. *White* Consent Decree, No. 19-cv-1442 at 1. The City seems to read this quote as "the plaintiffs *and* all past and present residents of public housing," but it is properly read as "the plaintiffs, *who are* all past and present residents of public housing." The fact that the sentence from the Consent Decree continues ". . . initiated this action . . ." raises questions as to the support for the City's argument.

Finally, the City invokes the Fourth Circuit's doctrine of virtual representation to argue that the *Johnson* plaintiffs' interests were adequately represented by the *White* plaintiffs. *See Klugh v. United States*, 818 F.2d 294, 300 (4th Cir. 1987). The fact that these new plaintiffs seek

8

monetary damages neither sought nor awarded in the *White* suit belies the City's puzzling argument.

In sum: The *Johnson* plaintiffs were not parties to the *White* suit, nor were they and the *White* plaintiffs in privity. The City has offered no convincing legal theory under which the *White* plaintiffs could have released the City from the claims of non-parties without safeguards like those offered by class actions. The *Johnson* claims are not precluded as res judicata.

## II.  Indispensable parties

The City next contends that under Rule 12(b)(7) of the Federal Rules of Civil Procedure, the *Johnson* plaintiffs have failed to join as indispensable parties the *White* plaintiffs, *White* plaintiffs' counsel, HACA, and the federal housing department.

Rule 12(b)(7) allows a court to dismiss an action for failure to join a party in accordance with Federal Rule of Civil Procedure 19. The court's analysis under a Rule 12(b)(7) motion to dismiss involves a two-step inquiry, of which only the first step is relevant in this case.[3] *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999). The court must determine whether the party is necessary to the action. *Id.* Under Rule 19(a), a party is necessary if "in that person's absence, the court cannot accord complete relief among existing parties," or "the person claims an interest relating to the subject of the action" such that a disposition of the action in the person's absence may "(i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed R. Civ. P. 19(a).

---

[3] The second step, analyzed only when a necessary party cannot be joined because its presence would destroy diversity, asks whether the proceeding can continue in the absence of the necessary party or whether that party is indispensable pursuant to Rule 19(b) and the action must therefore be dismissed. *Owens-Illinois, Inc.*, 186 F.3d at 440. This case does not rely on diversity jurisdiction.

9

"The inquiry contemplated by Rule 19(a) is a practical one, and is addressed to the sound discretion of the court." *Heinrich v. Goodyear Tire & Rubber Co.*, 532 F. Supp. 1348, 1359 (D. Md. 1982) (citing *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1108 (4th Cir. 1980)). "Courts are loath to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Owens-Illinois, Inc.*, 186 F.3d at 441.

The *White* plaintiffs are not necessary to this action, and the City's arguments are wholly without merit. When the *White* plaintiffs signed the consent decree in their case, they warranted that they were "entitled to enforce and settle the aforesaid claim and to give a full and complete release therefrom on behalf of herself and all interested parties." *White* Consent Decree, No. 19-cv-1442, ECF 98 ¶ 55. The City thinks that this means they were entitled to enforce and settle the case on behalf of themselves and all interested parties, including non-parties not involved in the suit. The City argues that when the *White* plaintiffs covenanted not to sue the city based on pre-consent-decree events, they were somehow also signing away the legal rights of any other non-party who might later come forward. Further, the City argues, because the 52 *White* plaintiffs recovered financially for their damages, they are necessary parties — presumably as co-defendants — in the *Johnson* defendants' suit to recover for their own damages. These arguments have no basis in the law. The court is capable of according complete relief for the *Johnson* plaintiffs' alleged damages even without the *White* plaintiffs' presence, and there is no risk of duplicative or inconsistent damages where any monetary damages awarded would go only to the suits' plaintiffs for their damages.

Nor is it necessary to have as a party the *White* plaintiffs' counsel, P. Joseph Donahue, who is also plaintiffs' counsel in the *Johnson* suit. In the City's understanding, when the *White* plaintiffs' attorney signed the consent decree in the course of his representation of the *White*

10

plaintiffs, he was promising that he would also not serve as counsel in any future suits against the City arising from these events. Mr. Donahue was not a party to the *White* lawsuit or consent decree, and he is not a necessary party in either of these lawsuits.

Nor are HUD and HACA necessary parties. The *White* plaintiffs dropped HACA as a defendant with their amended complaint, but they were still able to litigate the suit to resolution. *See White*, No. 19-cv-1442, Am. Compl., ECF 8-1 at 3. And HUD never was a party to the *White* suit. If the City wishes to join HACA and HUD as cross-defendants, the City remains free to file appropriate motions. But the plaintiffs — especially against the backdrop of the successful *White* consent decree — could quite plausibly achieve complete relief in the form of monetary damages even in HACA's absence. The suits need not be dismissed as violating Rule 19.

### III.    Impermissible collateral attack

The City argues that the suit is an impermissible collateral attack on the *White* Consent Decree, which would need to be reassessed to provide relief (for example, monetary damages) to the *Johnson* plaintiffs. This is incorrect, and *Johnson* is not an attempt to appeal from or appeal the consent decree. The City does not point to any plausible language in the consent decree that binds nonparties from suing for damages.

Further, the City argues that the *Johnson* plaintiffs were obligated to intervene in *White*. Once again, the *Johnson* plaintiffs were not privy to the *White* record and were under no obligation to intervene, even if that intervention would have been by right. *White* was not a class action; the *White* monetary payments went only to the *White* plaintiffs, and that settlement is not under attack in *Johnson*. *Johnson* need not be thrown out as impermissible collateral attacks.

### IV. Statute of Limitations

The City's reply (ECF 12) raises the issue of statutes of limitations to argue that claims in *Johnson* cannot be based on the City's actions before the *White* Consent Decree. (ECF 12 at 13–14). These claims will not be dismissed as untimely at this stage of litigation.

The § 1986 action for neglect to prevent a civil rights conspiracy requires a wrongful act after May 1, 2020 (one year); the Fair Housing Act claim requires a wrongful act after May 1, 2019 (two years); and the rest of the claims require a wrongful act after May 1, 2018 (three years). The City argues that Johnson moved into her apartment (which had never been inspected during her tenancy) in 2017, and 2017 was more than three years before the lawsuit was filed — meaning that the May 2021 suit is untimely.

At issue here is which of three ways this court will understand the factual predicates underlying the suit: as continuing effects of an initial violation; as a continuing violation that is part of a single, ongoing pattern of discrimination and allows consideration of otherwise time-barred events; or as a discrete act of discrimination that starts the clock anew. The "continuing harm" or "continuing violation" doctrine tolls the statute of limitations. *Litz v. Maryland Dept. of Env't*, 76 A.3d 1076, 1089 (Md. 2013). This allows the consideration of facts that are outside the strict statute of limitations period before the filing of the lawsuit, because the continuing wrongful act within the period is an extension of the wrong outside the period. But if only the continuing ill effects of prior tortious acts — rather than new or continuing tortious acts — occur within the limitations period, then the case presents not a continuing violation but rather a "continuing effect" or "continuing injury," which does not toll the statute of limitations.[4]

---

[4] Recovery would be limited to damages incurred within the statute of limitations period. "Although an action for a continuing tort may not be barred by the statute of limitations, damages for such causes of action are limited to those occurring within the three year period prior to the filing of the action." *Litz*, 76 A.3d at 1089 (internal quotes omitted).

12

*MacBride v. Pishvaian*, 937 A.2d 233, 240 (Md. 2007) abrogated in part by *Litz*, 76 A.3d at 1076. Finally, the court might understand the events at issue as a discrete and independently discriminatory act. "When an individual engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed . . . [and] each discriminatory act starts a new clock for filing charges alleging that act[.]" *Hill v. Hampstead Lester Morton Court Partners LP*, 581 Fed. App'x 178, 180–81 (4th Cir. 2014) (cleaned up) (finding that the most recent denial of a request for a disability accommodation was its own discrete act of discrimination allowing for a timely suit, even though the first denials of requests for that same accommodation occurred outside the limitations period). Even if the plaintiff renews a request for a previously denied action, that plaintiff may sue based on the new "discrete act" of discrimination if the defendant again denies the request. *Id.* at 181.

The City's briefing on the statute of limitations issue (ECF 12 at 13–14) is thin, as is the plaintiffs' surreply on the issue (ECF 18 at 4–5). The City has raised no arguments challenging the effects of the original non-inspection policy or the Shadow Policy on the named plaintiffs, instead arguing that the only violation possible was in 2017, when Johnson moved into Harbor House. The plaintiffs allege that the Shadow Policy was in effect as of the May 2021 filing of *Johnson*; regardless, neither named plaintiff's unit had been inspected as of that date. This court will not find that the non-inspection policy and the Shadow Policy (two forms of an allegedly discriminatory City policy that allegedly resulting in the non-inspection of the plaintiffs' homes) were mere continuing effects of one single 2017 violation. "While facts may arise at a later stage that indicate" otherwise, it is not apparent on the face of the Complaint that the action is barred by the statute of limitations. *Litz*, 76 A.3d at 1091–92, 1090 (noting that the "case has not yet been presented to a trier of fact to determine whether the only [wrongful acts happened within the statute of limitations period], and the fact-finder has not had an opportunity to determine if

13

the wrongful acts] were ongoing"). At this stage, the federal and state civil rights claims will not be dismissed as untimely.

The two-year-limited FHA claim (Count I) deserves special consideration. The FHA expressly announces that the period commences "after the occurrence of termination of an alleged discriminatory housing practice." 42 U.S.C. 3613(a)(1). Noting that the policy reasons for limiting the time to sue over discrete acts of discrimination are different from those challenging ongoing housing practices, the Supreme Court remarked: "we . . . conclude that where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982) (modified to update statute of limitations after change from 180 days to two years); *see, e.g., National Fair Housing Alliance v. Bank of America, N.A.*, 401 F. Supp. 3d 619, 629–30 (D. Md. 2019). The original non-inspection policy continued until June 2019, less than two years before the May 2021 filing of this suit. The FHA claim is therefore timely.

### V.     Local Government Tort Claims Act

Finally, the City's reply (ECF 12) argues that because the *White* Consent Decree's damages payouts exceeded the Local Government Tort Claims Act's (LGTCA's) damages cap,[5] "there can be no further damages arising out of the City or HACA's tortious conduct related to the same operative facts as *White* under Maryland law." (ECF 12 at 14–15). The plaintiffs, meanwhile, argue that the LGTCA does not apply to federal civil rights claims, particularly because a state tort damages cap operates via sovereign immunity, which it cannot assert against

---

[5] The cap is $400,000 per individual claim, and $800,000 per total claims arising "from the same occurrence for damages resulting from tortious acts or omissions." Md. Code Ann., CJP § 5-303(a)(1) (West 2022).

14

federal claims. (ECF 18 at 5). Local governments lack immunity from tort liability for violations of federal constitutional or statutory rights. *Housing Authority of Baltimore City v. Bennett*, 754 A.2d 367, 369 (Md. 2000) (citing *DiPino v. Davis*, 729 A.2d 354, 368–69 (Md. 1999)), *rev'd in part on other grounds*, *Espina v. Jackson*, 112 A.3d 442, 453–54 (Md. 2015) (noting 2001 state legislation responding to *Bennett* and declining to distinguish between state constitutional tort claims and state non-constitutional tort claims in the applicability of the LGTCA damages cap). The LGTCA cap will therefore apply only to the Johnson class's state law claim (count VI) but not to the federal claims (counts I–V). The interaction of the White Consent Decree and the LGTCA's damages cap need not be determined at this time.

## CONCLUSION

For the reasons discussed herein, the City's motion to dismiss will be denied. A separate Order follows.

3/30/22
Date

CCB
Catherine C. Blake
United States District Judge