**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TAMARA JOHNSON, *et al.*, | |
| v. | Civil Action No. CCB-21-1120 |
| CITY OF ANNAPOLIS. | Cross-Docketed in Related Case: *Estate of Fisher et al. v. City of Annapolis et al.*, Civ. No. CCB-21-1074 |

### MEMORANDUM

In 2019, the public learned that the City of Annapolis ("the City"), a defendant in these cases, had an agreement with the Housing Authority of the City of Annapolis ("HACA")[1] to exempt HACA properties from the rental property licensing and inspection requirements of its City Code. Following that revelation, several lawsuits were filed challenging the City's policy as discriminatory in violation of federal law and claiming that it had resulted in abysmal living conditions at HACA properties. Now pending before the court are the plaintiffs' motions for partial summary judgment against the City cross-filed in two of those cases.[2] The motions are fully briefed and no oral argument is necessary. *See* Local Rule 105.6. For the following reasons, the court will deny the plaintiffs' motions for partial summary judgment without prejudice.

### BACKGROUND

Before describing the facts of this case, the court must resolve the City's objections to the plaintiffs' statements of fact. To be considered on a motion for summary judgment, proffered evidence must be admissible. *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir.

---

[1] HACA is a defendant in *Fisher* and a third-party defendant in *Johnson*, but it is not a target of the instant motions.

[2] "The plaintiffs" collectively refers to the Estate of DaMon R. Fisher, Mr. Fisher's personal representatives Darlene Faith Richardson and Robert Smith, Jr., and Tamara Johnson, the other named plaintiffs, and the unnamed class members in 21-1120.

2023) (citing *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)).

The City argues that the plaintiffs' Exhibits A, B, and C are not properly authenticated. Objs. to Statement of Undisputed Material Facts at 4, ECF 117 ("Fact Objs.").[3] These objections are unavailing. Exhibit A, a copy of the City Council's Resolution R-26-19, is self-authenticating under Fed. R. Evid. 902(5). *Williams v. Long*, 585 F. Supp. 2d 679, 686-87 (D. Md. 2008). Exhibit B, an affidavit signed by Teresa Sutherland and submitted in another case, is admissible because the City filed the identical document, authenticated by Teresa Sutherland in an affidavit submitted in this case, as an exhibit in support of its opposition to the plaintiffs' motion. Opp'n Ex. C at 10-11, ECF 120-4. Exhibit C, a list of Code violations discovered during the City's 2016 inspections of HACA properties, is admissible because it was produced by the City or HACA pursuant to a Maryland Public Information Act request and the City did not object to the document's authenticity when the plaintiffs provided it with a copy and the opportunity to dispute its legitimacy. Mot. Ex. E ¶¶ 3-7, ECF 103-6; *see Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 552-53 (D. Md. 2007) (citing *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, No. IP 94-1175-C-T/G, 1998 WL 1988826, at *6 (S.D. Ind. May 13, 1998)); *Wolf Lake Terminals, Inc. v. Mut. Marine Ins. Co.*, 433 F. Supp. 2d 933, 944 (N.D. Ind. 2005) (holding documents were sufficiently authenticated under Fed. R. Evid. 901(7) and 902(5) by letter verifying that they were obtained pursuant to a Freedom of Information Act request).

The City also raises a host of objections to the plaintiffs' statements based on relevance and lack of competent supporting evidence. The court resolves these objections by providing its

---

[3] For simplicity, all record citations refer to the docket in *Johnson*, 21-1120, unless otherwise indicated.

own citation for the statements in its recitation of the facts, which will only include information that the court has found sufficiently relevant under Fed. R. Evid. 401.

Finally, the City asserts that the plaintiffs cannot cite allegations it made in its third-party complaints against HACA and the Department of Housing and Urban Development ("HUD") in *Johnson*, and the briefing on the motions to dismiss those complaints, as proof of the truth of those allegations. *See* Fact Objs. at 3-4. Specifically, the City took the plaintiffs' allegations of the conditions at HACA properties and discriminatory treatment and reasserted them, at times verbatim, against HACA and HUD. *Compare* Compl., ECF 1 *with* Second Am. Third-Party Compl., ECF 64 *and* Opp'n to Mot. to Dismiss Third-Party Compl., ECF 87. A party may take inconsistent positions in pleading claims or defenses. Fed. R. Civ. P. 8(d)(3). "[T]his principle would also include inconsistent positions taken in pleadings in a complicated joinder situation, involving, as here, the contingent liability of third parties." *Cont'l Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971). As in *Continental*, the City's third-party complaints "assumed the truth of [the plaintiffs'] allegations against [it] as a necessary predicate in establishing [HACA's and HUD's] duty to indemnify. [The City] was thus required, at least implicitly, to take a position inconsistent with its position in the [principal] action." *Id.* The court agrees with *Continental*'s reasoning that construing the City's allegations in its third-party complaints as admissions of fact would improperly deny the City an opportunity to "seek[] recovery [from HACA and HUD] in the event of liability in the principal action" while also defending the principal action on the merits, *id.*, and will strike from consideration paragraphs asserting that facts are undisputed based on the City's third-party complaints.

These objections resolved, the court turns to the relevant and evidentiarily supported factual background.

3

## I.  Legal Background

HACA is established by Maryland law, Md. Code Ann., Hous. & Cmty. Dev. §§ 12-201, 13-103, and "consists of seven Commissioners appointed by the Mayor of Annapolis and approved by the Annapolis City Council," *id.* § 13-104(a)(1). HACA's properties "are subject to the planning, zoning, sanitary, health, fire, housing, subdivision, and building laws, ordinances, codes, rules, and regulations that apply where the housing project is located." *Id.* § 12-403. However, Maryland law permits the City to "make exceptions to its sanitary, building, housing, fire, health, subdivision, or other similar laws, rules, regulations, and ordinances or make any changes to its map or master plan" "[t]o aid and cooperate in the planning, undertaking, construction, or operation of housing projects" within its jurisdiction. *Id.* § 12-506(b)(9).

The Annapolis City Code requires that any "single rental dwelling unit [or] multiple dwelling" be licensed by the City's Department of Planning and Zoning ("DPZ"). Annapolis, Md., City Code § 17.44.010 (2019).[4] To receive an operating license, a property owner must submit an application and agree to an initial inspection of the property at which DPZ will determine whether the property is in compliance with the City Code's Residential Property Maintenance Code chapter, *id.* ch. 17.40, and otherwise complies with the Licensing chapter, *id.* ch. 17.44. *Id.* § 17.44.030. A license may only be issued if, after inspection, the property is found to comply with the City Code. *Id.* § 17.44.050. Licenses must be renewed either annually or biennially, depending on property size, *id.* § 17.44.060, and additional inspections may be required for renewal, *id.* § 17.44.030. The City charges a fee for a license's issuance and

---

[4] All "City Code," "Resolution," and "Ordinance" citations refer to those of Annapolis, Maryland. Annapolis adopted a fully revised Rental Unit Licenses chapter of the Buildings and Construction title of its City Code in 2020. *See* City Code ch. 17.44 n.8 (2024) (citing Ord. O-26-19 (Jan. 13, 2020)). The 2019 Code is substantively representative of the provisions that were in effect throughout the relevant period.

renewal. *Id.* § 17.44.040(A). An owner's operating license may be suspended upon discovery of a violation of either the Licensing or Property Maintenance chapter, *id.* § 17.44.090(A), and the owner will be given thirty days to correct the violation, *id.* §§ 17.44.090(A), (B). If the violation is not remedied, the operating license will be revoked. *Id.* §§ 17.44.090(B), (C).

## II.  HACA Properties

Practically all the public housing in the City is owned and operated by HACA. Md. Code Ann., Hous. & Cmty. Dev. § 13-103; *see id.* § 12-401(a). During the time relevant to this litigation, HACA owned and operated six low-income housing properties: Bloomsbury Square; Harbor House; Newtowne Twenty; Eastport Terrace; Robinwood; and Morris H. Blum Senior Apartments. Mot. Ex. D ¶ 4, ECF 103-5; *see* Opp'n at 14-15. These properties contained 790 individual housing units; the City had 831 total public housing units as of 2015. Opp'n Ex. A at 36, ECF 120-2; Mot. Ex. D ¶ 9.

According to publicly available population data from 2015, 91.3% of public housing units (759 of 831) in the City were occupied by Black residents. Mot. Ex. D ¶ 9; *see* Opp'n at 14 (agreeing that there is "no dispute about the numbers displayed in Census and ACS tables"). As of 2019 the population of Black residents at every HACA property exceeded 93%, except Morris H. Blum Senior Apartments, where the population of Black residents was 86%. Opp'n Ex. H tbl. 1, ECF 120-9.[5] A 2015-2019 survey shows that the City as a whole had 2,251 rental households occupied by Black residents (including HACA units) and 3,509 rental households occupied by White (non-Hispanic) residents. Mot. Ex. D. ¶¶ 11-12. As of the 2010 census, the City's population was 53.5% White, 25.7% Black, and 16.8% Latino. Mot. Ex. D ¶ 6.

---

[5] Specifically, Black residents made up 93% of the population at Newtowne Twenty, 97% at Robinwood, 94% at Bloomsbury Square, and 97% at Harbor House and Eastport Terrace (calculated together). Opp'n Ex. H tbl. 1.

### III. Non-Enforcement Policy

From the establishment of HACA until 2016, the City did not enforce its licensing and inspection requirements with respect to any HACA properties, a practice the court will refer to as the "non-enforcement policy." Opp'n Ex. A ¶¶ 2-4. It did not issue any operating licenses to HACA properties, nor did it require HACA properties to acquire a license before they could operate. *Id.* ¶¶ 13, 31. It inspected HACA properties on a "complaint only" basis. *Id.* ¶¶ 3, 5, 31.[6] This policy was apparently not formally memorialized. Although the City identifies a March 5, 1965 "Cooperation Agreement" between the City and HACA, the Agreement merely states that the City will, "insofar as the Local Government may lawfully do so, (i) grant such deviations from the building code of the Local Government as are reasonable and necessary to promote economy and efficiency in the development and administration of such Project, and at the same time safeguard health and safety." Opp'n Ex. C at 24. The City viewed its non-enforcement policy as a permissible "exception" to its Code pursuant to Maryland law, Md. Code. Ann., Hous. & Cmty. Dev. § 12-506(b)(9), and was advised several times that such an exception was legal, *see* Opp'n Ex. B at 3-5, ECF 120-3. Furthermore, the City believed that it had no duty to inspect the HACA properties because HACA inspected its own properties as required by federal law, Opp'n Ex. C ¶¶ 11-12, and HUD also conducted annual inspections, *see* 24 C.F.R. § 902.13. The City justified the non-enforcement policy as a way to reduce HACA's financial obligations and the burden of duplicative inspections. Opp'n Ex. C ¶ 15.

In 2016, following the election of a new Mayor, the City conducted general inspections of all HACA properties for the first time. Opp'n Ex. A ¶ 42. The 2016 inspections identified at

---

[6] In the fifteen years for which records were available, from 2008 to 2022, the City conducted approximately 140 total inspections across all six HACA properties. Opp'n Ex. A at 18-29. The data may not have captured every inspection conducted by the City.

least 2,498 specific Code violations across the 790 individual units at HACA properties. Mot. Ex. C, ECF 103-4.[7] These violations included countless instances of broken appliances, damaged lights, stains, water damage, leaks, collapsing ceilings and walls, pests including bed bugs, cockroaches, and rodents, electrical issues or failures, mold, defective or non-compliant smoke detectors, painted-over sprinkler heads, missing fire extinguishers, and much more. *See generally id.* Nevertheless, the City apparently reverted to its "complaint only" inspection regime at some point following the 2016 inspections. *See* Opp'n Ex. A ¶¶ 31-32; Opp'n Ex. C ¶ 12.

## IV. *White* Litigation and Response

In mid-May 2019, HACA was involved in a lawsuit against a HACA tenant and, at a hearing in the case, a City inspection worker testified that the City had decided to exempt HACA from the City's licensing requirement. Opp'n Ex. C at 10-11. Shortly after the City publicly acknowledged the non-enforcement policy, fifty-two HACA residents filed suit in this court alleging that the policy was illegally discriminatory. *White v. City of Annapolis*, No. 19-cv-1442-CCB (D. Md. 2019). The *White* litigation ended with the imposition of a consent decree enacting prospective equitable remedies intended to improve the City's public housing, and awarding monetary damages to the plaintiffs. Consent Decree, *White*, No. 19-cv-1442-CCB (D. Md. Jan. 14, 2021), ECF 80; Opp'n Ex. A at 75-111. On June 10, 2019, in the wake of that suit, the City ended the non-enforcement policy and resolved to "begin requiring rental operating licenses for HACA properties based on inspections completed by the [DPZ]." Mot. Ex. A, ECF 103-2; Opp'n

---

[7] The City argues that this exhibit "only addresses housing code violations . . . for one particular HACA property on a specific date, the Bloomsbury Square Apartment on May 6, 2016, and no other HACA property." Opp'n at 10. Although the first page of the exhibit reflects a violation report for May 5-6, 2016, at Bloomsbury Square, review of the entire exhibit reveals that it also includes violation reports for Eastport Terrace, Opp'n Ex. C at 6, Harbor House, *id.* at 27, 701 Glenwood Street (the street address of Morris H. Blum Senior Apartments), *id.* at 72, Newtowne Twenty, *id.* at 85, and Robinwood, *id.* at 100.

Ex. C ¶ 18. Maryland's General Assembly also acted, passing a new provision prohibiting the City from "mak[ing] an exception for [HACA] to a law, a rule, a regulation, or an ordinance that: (1) operates in the City of Annapolis; and (2) relates to: (i) licensure; or (ii) the inspection of real property." Md. Code Ann., House & Cmty. Dev. § 13-112 (effective Oct. 1, 2020).

## V.  Procedural History

Plaintiffs in these two cases filed suit in early May 2021 alleging violations of the Fair Housing Act, several federal civil rights acts, the Equal Protection Clause of the Fourteenth Amendment, and the Maryland Declaration of Rights.[8] In *Fisher*, the plaintiffs sued the City and HACA. Compl., ECF 1 in 21-1074. In *Johnson*, a class action, only the City was named as a defendant. Compl., ECF 1 in 21-1120. The defendants moved to dismiss in both cases; in *Fisher* both the City's and HACA's motions were granted in part and denied in part, Mem., ECF 37 in 21-1074, and in *Johnson* the City's motion was denied, Mem., ECF 19 in 21-1120. The City then brought third-party complaints against HUD in both cases and against HACA in *Johnson*. Third-Party Compl. (HUD), ECF 47 in 21-1074; Third-Party Compl. (HUD), ECF 28 in 21-1120; Third-Party Compl. (HACA), ECF 26 in 21-1120. The third-party defendants moved to dismiss, and the court granted HUD's motions and denied HACA's. Mem., ECF 117 in 21-1074; Mem., ECF 112 in 21-1120. The court granted class certification in *Johnson* on February 26, 2023. Order, ECF 97 in 21-1120. Now pending are the plaintiffs' motions for summary judgment on their Fair Housing Act claim in each case.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[8] The plaintiffs in *Fisher* also alleged violations of Maryland law not relevant to this motion.

to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007). Generally, "when there is a close question and 'reasonable minds could differ' when weighing the facts against the law, then summary judgment is inappropriate." *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989)).

## ANALYSIS

The Fair Housing Act ("FHA") outlaws, in relevant part, "mak[ing] unavailable or deny[ing], a dwelling to any person because of race, color, religion, sex, familial status, or national origin," and "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. §§ 3604(a), (b). HUD has promulgated regulations explaining that these provisions prohibit "failing or delaying maintenance or repairs of sale or rental dwellings," 24 C.F.R. § 100.65(b)(2), "refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or

national origin," *id.* § 100.70(d)(4), and "enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, religion, sex, handicap, familial status, or national origin," *id.* § 100.70(d)(5). The regulations provide that FHA liability may be established by demonstrating a practice's discriminatory effect, which is defined as "actually or predictably result[ing] in a disparate impact on a group of persons or creat[ing], increas[ing], reinforc[ing], or perpetuat[ing] segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin." *Id.* §§ 100.500, 100.500(a).

In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court affirmed the validity of disparate impact causes of action under the FHA. 576 U.S. 519 (2015) ("*ICP*"). The Fourth Circuit has explained that the Supreme Court's ruling in *ICP* establishes a "three-step, burden-shifting framework" for analyzing such a claim. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018). The plaintiff bears the initial burden to "demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class." *Id.* (citing *ICP*, 576 U.S. at 542-43). If the initial requirement is met, the burden shifts to the defendant to "state and explain the valid interest served by their policies." *Id.* (quoting *ICP*, 576 U.S. at 541-42). Finally, the plaintiff may prevail by proving that the defendant's asserted interests "could be served by another practice that has a less discriminatory effect." *Id.* (quoting *ICP*, 576 U.S. at 527); *see* 24 C.F.R. § 100.500(c).

To satisfy the first step of the disparate impact inquiry, the plaintiffs must "begin by identifying the specific practice that is challenged." *Reyes*, 903 F.3d at 425 (quoting *Wards Cove*

*Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)) (internal alterations omitted). They must then identify a disparate impact and "'demonstrate that the disparity they complain of is the result of one or more of the practices that they are attacking, . . . specifically showing that each challenged practice has a significantly disparate impact' on the protected class." *Id.* (quoting *Wards Cove*, 490 U.S. at 657). Additionally, as "in all cases of loss," the plaintiffs must establish that the defendant's actions proximately caused the harm of which they complain. *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017).

### A. Challenged Policy

The plaintiffs challenge the City's non-enforcement policy as discriminatory. Although the City points out that it did inspect HACA properties in response to complaints, it readily admits that "[a]t all times relative to the allegations contained in Plaintiffs' Complaint, HACA properties were exempt from local licensure requirements" and therefore were not inspected on a regular basis. Opp'n at 32. The existence of the City's non-enforcement policy, as defined by the court, is therefore undisputed.

The City argues extensively that the non-enforcement policy cannot be a violation of the FHA because it was "permitted pursuant to Maryland law." *Id.* at 32-33 (citing Md. Code Ann., Hous. & Cmty. Dev. § 12-506(b)(9)). This argument is a nonstarter. A municipality is not free to adopt a discriminatory practice simply because it is technically allowed under the State code. Such a rule would undermine the entirety of federal civil rights law. If there were any doubt, and there is not, the FHA dispels it: "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615; *see* U.S. Const. art. VI, cl. 2.

### B.  Statistical Disparity

Next, the plaintiffs must identify "a statistically and practically significant discrepancy between 'valid . . . comparative populations.'" *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. 18-cv-1919-SAG, 2023 WL 2633636, at *7 (D. Md. Mar. 24, 2023) (quoting *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 963-64 & n.11 (9th Cir. 2021)) (alterations in original).[9] The plaintiffs' statistical disparity evidence is straightforward and is explained in expert reports prepared by Dr. Allan M. Parnell. *See generally* Mot. Ex. D. Undisputed HUD data from 2019 show that five of the six HACA properties at issue had populations that were more than 90% Black.[10] Opp'n Ex. H at tbl. 1. The population at the sixth HACA property, Morris H. Blum Senior Apartments, which has age restrictions for its tenants, was 86% Black. *Id.* The plaintiffs compare these populations against that of the City generally, which, as of the 2010 Census, was 53.5% White, 25.7% Black, and 16.8% Latino, and conclude that the HACA properties' populations are disproportionately Black. Mot. Ex. D ¶¶ 7-9.

The City argues that these data are insufficient to establish a relevant disparity because the plaintiffs "fail to take into account confounding variables or potentially important factors including income, wealth, age, or family size." Opp'n at 26-27. The City offers an expert report from Dr. William A. Huber to challenge Dr. Parnell's report. Opp'n Ex. G, ECF 120-8. But the vast majority of Dr. Huber's criticisms focus on Dr. Parnell's use of 2010 Census data at the

---

[9] Unpublished opinions are cited for the soundness of their reasoning rather than any precedential value.

[10] In his initial report, Dr. Parnell described 2010 Census data on the racial compositions of the Census blocks (basically the immediate neighborhoods) in which the HACA properties are located. Mot. Ex. D ¶¶ 5-8. The defendants challenged these data as outdated and overly broad, and Dr. Parnell supplemented his report with 2019 data specific to the HACA properties compiled by HUD, on which the court relies. Opp'n Ex. H at 4-6.

Census block level, *see id.* ¶¶ 6-8, 12-16, 22(a)-(b), an issue that is no longer relevant given Dr.

Parnell's supplemental report using 2019 property-specific data, *see* Opp'n Ex. H. Dr. Huber

does not opine that Dr. Parnell should have accounted for confounding variables in his analysis,

and Dr. Parnell testified that "there was no need to account for [confounding variables]" in this

case, because his analysis was "straightforward descriptive statistics of composition." Opp'n Ex.

I at 18:21-19:3, ECF 120-10. The court can see no reason why confounding variables of the type

described by the City would have an appreciable impact on the statistical analysis in this case.[11]

Income, wealth, and age simply do not relate to the racial disparity at issue. Family size may

affect comparisons between population-level and household-level data, but accounting for this

variable would likely have only a minimal effect on the ultimate population numbers.[12]

    The City also argues that Dr. Parnell's analysis of the data is inadequate because he

compared incommensurate populations. Opp'n at 27-31. Dr. Parnell's analysis compares the

racial compositions of the populations of the HACA properties to those of the City in general to

---

[11] The City may be attempting to compare this case to other contemporaneous FHA cases, many of which feature complex regression analyses illustrating the relationships between a challenged policy, adverse effects, and racial compositions. *See, e.g.*, *Nat'l Fair Hous. All.*, 2023 WL 2633636, at *14-15; *Prince George's Cnty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 762-63 (D. Md. 2019). But the comparisons in those cases are far less straightforward than the case at hand: *National Fair Housing Alliance* involves allegations that Bank of America maintained its properties in communities of color at a lower standard than those in majority-White communities. 2023 WL 2633636, at *1-4. And *Prince George's County* focuses on allegations that Wells Fargo engaged in predatory lending practices focused on communities of color, which, among other things, drove down the County's property tax revenues. 397 F. Supp. 3d at 762-63. Determining the existence of such adverse effects and their relation to race is far more complicated that resolving whether a set of properties singled out for differential treatment were disproportionately populated by Black residents. *Sw. Fair Hous. Council*, 17 F.4th at 963 & n.10. In Dr. Parnell's words, "[t]he question [in this case] is fairly direct and not that complicated." Opp'n Ex. I at 26:12-14.

[12] The City also argues that Dr. Parnell's reports cannot be used in *Fisher* because Dr. Parnell testified that he was not familiar with the allegations in *Fisher*. *Fisher* Opp'n to Mot., ECF 123 in 21-1074. The information in Dr. Parnell's reports is relevant to both *Johnson* and *Fisher* and the population data are identical in both cases. Dr. Parnell's reports are viable evidence in *Fisher*.

conclude that the HACA properties housed a disproportionate number of Black residents. Mot. Ex. D ¶¶ 7-9. Dr. Huber contends that the proper comparator population is "rental units within the City." Opp'n Ex. G ¶¶ 9, 17. The court agrees with Dr. Huber in principle.

"When a defendant makes a deliberate choice to subject only a subset of its customers or constituents to a certain policy, it is proper to compare the demographics of that subset to the larger population of [constituents] to which the policy does not apply to discern whether the decision to limit a policy to that subset produced any disproportionate effect." *Sw. Fair Hous. Council*, 17 F.4th at 963; *see Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065-66 (4th Cir. 1982) (comparing racial composition of prospective applicants for terminated public housing project to racial composition of general population); *White v. City of Annapolis*, 439 F. Supp. 3d 522, 538 (D. Md. 2020). The plaintiffs challenge the City's policy of exempting HACA properties from its licensing and inspection regime, which only applies to rental properties. City Code § 17.44.010. Comparing the HACA properties to the general population sweeps in an untold number of citizens who are not subject to the licensing policy in any event and are therefore not relevant to the analysis. The proper comparison is between the racial composition of the population subject to the licensing and inspection regime, *i.e.* all renters in the City, and the racial composition of the population subject to the non-enforcement policy, *i.e.* renters in HACA properties.

Although Dr. Huber isolated the correct comparator population, his statistical analysis only calculates the odds that Black and White householders in the City are renters. Opp'n Ex. G ¶ 19. The relevance of the odds that a householder is a renter or a comparison of these odds between Black and White householders is not apparent, and Dr. Parnell points out that odds are not a useful metric for analyzing the question at hand. Opp'n Ex. H ¶ 8. Despite using the wrong

comparator, Dr. Parnell's statistical analysis comparing the racial proportions of the specific and general populations has greater mathematical relevance.

The experts' reports appear to include data describing the racial composition of the City's rental households in recent years. According to data from a 2015-2019 study, the City as a whole had 2,251 rental households occupied by Black residents (including HACA units) and 3,509 rental households occupied by White (non-Hispanic) residents. Mot. Ex. D ¶¶ 11-12. Using these data, Dr. Parnell determined the proportion of Black and White rental households that were located in HACA properties, *id.*, but this analysis only shows that a greater proportion of the Black renter population lives in HACA properties than the proportion of White renters that lives in HACA properties, numbers which could belie the true population comparison depending on the overall populations of Black and White renters. According to Dr. Huber's report, in 2020, approximately 2,068 rental households in the City were occupied by Black residents (including HACA units), and 3,615 rental households were occupied by White (non-Hispanic) residents. Opp'n Ex. G tbl. 3. Nevertheless, because the expert reports do not clearly describe the data's source and significance with respect to the correct population comparison, the court will not endeavor to undertake the proper statistical analysis of these data in the first instance. New statistical analyses comparing the relevant populations using the best data currently available may be required.

### C. Robust Causal Connection

Without the relevant population comparison in the record, the court will not undertake to analyze whether the disparity, if any, is causally related to the City's non-enforcement policy.

### D.  Proximate Cause

The plaintiffs' motions also lack sufficient evidentiary support to establish their alleged harm. A claim under the FHA is "akin to a 'tort action'" and requires the plaintiffs to prove that the defendant proximately caused the harm alleged. *Bank of Am. Corp.*, 581 U.S. at 201. Because the court does not consider the plaintiffs' statements of fact based on allegations in the City's third-party complaints and related briefing, *see supra* p. 3, the plaintiffs' evidence of harm consists of the reports cataloging the violations discovered by the City during its 2016 inspections of the HACA properties.[13] Mot. Ex. C. Although these violations are relevant and may be actionable because the non-enforcement policy may constitute a continuing violation of the FHA, *Johnson v. City of Annapolis*, No. 21-cv-1120-CCB, 2022 WL 959149, at *6-7 (D. Md. Mar. 30, 2022) (citing 42 U.S.C. § 3613(a)(1)); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982), the class certified in *Johnson* is "limited to the two years . . . immediately preceding the filing of the lawsuit," from May 7, 2019 to May 7, 2021, for the purposes of the FHA claim. Order Certifying Class, ECF 97. Proof of the poor conditions at HACA properties in 2016 is insufficient to support summary judgment for a class limited to HACA tenants from 2019 to 2021.[14]

---

[13] Although the plaintiffs do not cite or rely on them, the record also contains inspection reports showing that poor conditions existed at Robinwood in September 2019, Mot. for Class Certification Ex. 9, ECF 54-11, Morris Blum in November 2019, Mot. for Class Certification Ex. 10, ECF 54-12, and Eastport Terrace in January 2020, Mot. for Class Certification Ex. 11, ECF 54-13. These reports do not establish illegal conditions at all HACA properties throughout the class period, and therefore also cannot support class-wide summary judgment. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016) (explaining that representative evidence can support class-wide liability if "each class member could have relied on that sample to establish liability if he or she had brought an individual action.").

[14] The plaintiffs suggest that two sworn statements by a City employee establish the existence of illegal conditions at HACA properties during the relevant period. *See* Reply at 11-12 (quoting Opp'n Ex. A ¶¶ 11-12). General observations that the HACA properties were "distressed and in

Mr. Fisher's estate alleges that he resided in HACA properties from 2012 until his death in 2020. *Fisher* Compl. ¶¶ 15, 28, ECF 1 in 21-1074. On the Court's review, there is no evidence in the record to confirm Mr. Fisher's residence period other than an admission that his apartment at Harbor House was inspected in 2020, four years after the only proof of poor conditions at that location, Opp'n Ex. A ¶ 32, and the City does not admit Mr. Fisher's residence. *See* City's *Fisher* Answer ¶¶ 15, 28, ECF 46 in 21-1074. Summary judgment is therefore inappropriate.

The court does not reach steps two and three of the FHA analysis because the plaintiffs have not met their burden of proof at step one.

## CONCLUSION

The plaintiffs' motions for summary judgment are not sufficiently supported by the evidence in the record at this time. The court has identified some deficiencies, and additional discovery appears to be necessary. The court will therefore deny the plaintiffs' motions for summary judgment without prejudice to renewal after additional evidence is obtained.

A separate Order follows.

 <u>  2/22/2024  </u>                                      <u>    /s/     </u>
Date                                                                  Catherine C. Blake
                                                                      United States District Judge

---

need of redevelopment" and "beyond [their] useful life" are not sufficient to prove conditions below the standards of the City Code. *Id.*